

FILED ___ ENTERED
LOGGED ___ RECEIVED

JUL 11 2013

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ___
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

READER SUPPORTED NEWS, et al,

CIVIL ACTION NO. ELH 13CV2008

Plaintiffs,

v.

CHIEF JUDGE COL. DENISE LIND, et al,

Defendants,

---

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

READER SUPPORTED NEWS
1042-B North El Camino Real #394
Encinitas, CA 92024

SCOTT GALINDEZ
4324 8th Street NW
Washington DC 20011

KAY RUDIN
P.O. Box 113
Westport, CA 95488

WILLIAM M. SIMPICH
1736 Franklin Street, 10th Floor
Oakland, CA 94612

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### I. SUMMARY OF ARGUMENT

Criminal proceedings, including court-martial proceedings, must be open to the public except in limited circumstances. The First Amendment requires public access unless the government demonstrates that closure is necessary to further a compelling government interest and narrowly tailored to serve that interest, and the Court makes specific findings that closure is warranted.

Due to the intense media and public interest in the Manning trial, various "remote sites" away from the courtroom have been set up by the military. The military judge, defendant Denise Lind, has determined pursuant to R.C.M. 806 that closed circuit transmissions are necessary to accommodate an overflow of spectators. These sites have been described by military personnel as "extensions of the courtroom". The problem is that the military is taking deliberate action to make it difficult for the media to cover the Manning trial.                    One looming problem is that large numbers of people will want to see the testimony of Bradley Manning and the closing arguments of the trial – far more people than the courtroom can accommodate. Remote sites have been set up by the military, but with restrictions that have no rational basis. Plaintiffs have limited access to the media operations center, inadequate access to their laptops while in the media center; no access to their cellphones at any of the remote sites or their laptops while at the other remote sites; and no access to the audio feed distributed to the parties at the end of each court day.

2

The remote sites are the

media operations center about a half mile from the courtroom and reserved for members

of the media which seat seventy journalists; the "overflow trailer" approximately two

hundred feet from the courtroom which seats approximately forty to fifty spectators; and

the public theater approximately three hundred yards from the courtroom, which can be

adjusted to seat 540 spectators.                During the first four weeks of the trial, the

plaintiffs were denied press credentials which would enable them any access to the media

operations center. This meant that they could not type their story or type notes while

watching the trial.        One credential was finally provided on June 26 – but the plaintiffs

need three credentials, just as all members of the media need additional credentials.

The initial denial was based on an unsupported claim that the press

advisory stated that any news agency has to be picked up by the media monitoring service

Vocus in order to be eligible for media credentials. In fact, the press release said nothing

of the kind.

Plaintiffs seek the relief described below:

1. Plaintiffs need three media credentials – one for each staff member. Both

reporters seek access to the media operations center, and the sketch artist seeks an equal

opportunity to gain entry to the courtroom as a member of the media. There is no rational

basis for the denial of these media credentials. There is plenty of room at Fort Meade for

a larger media operations center – for example, there is a 540 seat theater by the public at

the beginning of the trial that could be shared by the media and the public.        2.

Another ongoing problem is that the media operations center is the only remote site

where members of the press have access to their laptop computers. Members of the

3

public and uncredentialed media do not have access to their laptops at any of the remote sites. When it comes to courtroom access, the public has the same First Amendment rights as the media.                                        3. At the media operations center, downloads and uploads are not allowed during the trial until the court is in recess.                                        4. Neither the media nor the public has access to their laptops at the other remote sites.

                                        5. Cellphones are also not allowed at any of the remote sites, even for texting purposes.  Cellphones are highly useful tools that don't need to be used for talking.    The problems set forth in 3-5 above illustrate that the defendants have created a situation where journalists on-site cannot adequately communicate with each other once one of them has entered the media operations center. Nor can the journalists in the media operations center contact  their editors or file their story while court is in session without going through security, leaving the media operations center and going into the parking lot, and then repeating the process in order to re-enter. This is a situation where journalists are arbitrarily being denied the tools of their trade.  Minutes matter when filing a story.

                                        Nor does the media and public have the right to capture the audio feed, even though the Army provides the audio feed on a CD to the defense at the close of each day.  Neither the media nor the public can review the unofficial transcript until the next day, despite the importance in fact-checking the story before it is transmitted on an international basis.

                                        The government has not provided – and cannot provide – any legal basis for the discriminatory policies described here.  There is plenty of room at Fort Meade to

4

enable all parties to remotely watch the proceedings, use their laptops in an unrestricted manner, and use their cellphones for texting and internet purposes without talking to anyone as a matter of common sense.

There is no non-discriminatory reason for the Army permitting the defense contemporaneous access of the audio feed on a daily basis  and denying this access  to the plaintiffs, the media, and the public.                                                                          Nor does it appear that the trial court made any of the requisite findings pursuant to RCM 806 that could support the actions described above.                                              These violations are particularly egregious in light of the First Amendment's mandate that even temporary deprivations of the right of public access constitute irreparable harm, and given the Supreme Court's frequent pronouncements that openness promotes not just public confidence in the criminal process but also accuracy in fact-finding and ultimate outcomes. The First Amendment thus demands reasonable access to the trial phase of a court-martial while the proceedings are taking place.                              Plaintiffs sought relief from the trial judge in a motion to intervene filed on May 31, 2013, the day after their credentials were denied.  The court took the motion under advisement on June 3, 2013, and denied the motion on June 10, 2013 on the basis that the court had no jurisdiction to address the need for media access.                               After a year spent litigating similar issues in the related case of *Center for Constitutional Rights v. Lind*, the Court of Appeals of the Armed Forces recently decided that the military appeals courts lack jurisdiction over the mandamus claims of media and public petitioners seeking access to judicial documents. That leaves Article III courts as the only forum in which the press and public may seek vindication of their constitutional right of access.  Having exhausted all

5

possible avenues for relief in the military system, plaintiffs seek preliminary injunctive relief in this Court pursuant to the First Amendment and the mandamus remedy authorized in 28 U.S.C. § 1361.

## II. STATEMENT OF FACTS

Plaintiffs include the Reader Supported News, a news reporting organization which has covered the court-martial proceedings against PFC Bradley Manning since the trial that began on June 3, 2013.

Notwithstanding the extraordinary degree of public interest in these proceedings, the media and public have been denied the right to capture the audio feed of the trial, even though it is been provided to the defense on a daily basis. Similarly, the media and the public have been denied the right to use their laptops at any of the remote sites that provide the closed-circuit transmissions of the trial, except in the media operations center. Even there, the media is not allowed to upload and download except during times that court is not in session. Neither the media nor the public are allowed to use their cellphones at any of the remote sites, even for texting purposes. Declaration of William Simpich, ¶ 4 Indeed,

the restrictions on access to these documents in the Manning case have made it exceedingly difficult for credentialed reporters, including several of the named plaintiffs, to cover the proceedings consistent with their journalistic standards and professional obligations. Simpich Decl. ¶ 7 To the best of plaintiffs' knowledge, neither Judge Lind, nor any other government official, has made any ruling about how various reporters are to be denied media credentials in order to use

6

the media operations center or to be one of the ten media members permitted in the media pool in the courtroom. PFC Manning waived his right to a jury trial, mooting any concern that might exist for contamination of the potential jury pool. Nor, from the record that is available, has there been any indication that defendant Lind has made some specific finding of justification for restricting all or partial access by journalists to the media operations center, after careful consideration of less-restrictive alternatives.

Simpich Decl. ¶ 5                                    These restrictions to media

access have been drawn over the Manning proceedings despite written requests made to the trial court by the plaintiffs (made on their own behalf and on behalf of the public) and by various other media organizations seeking greater public access.

As of this date, the three individual Plaintiffs are

forced to share one media credential to the media operations center. This will make proper coverage very difficult during key events such as the testimony of Manning or the closing arguments of the trial.    The sketch artist is not interested in the media center, as she needs to be in the courtroom itself.    Others have been denied access to the media operations center simply because they did not file during the defendants' self-imposed deadline between May 10 to May 29. Members of the media were not informed that there were adequate sites for them to view the proceedings outside of the courtroom or the media operations center.  Simpich Decl. ¶¶ 6-7

Under the leadership of Defendant Linnington, the Military District of Washington sent out a press release to undisclosed parties on May 10, 2013, stating that all parties seeking media credentials needed to provide a media ID, a letter on official letterhead, and "examples of posts that demonstrate recent coverage of the military

7

judicial system" no later than May 29, 2013. Simpich Decl. ¶ 8          Reader

Supported News obtained knowledge of this press release, and properly requested media

credentials for journalists Scott Galindez, Bill Simpich and courtroom sketch artist Kay

Rudin on May 28. They were mandated to provide articles on their previous military

coverage as a prerequisite for obtaining credentials. Included were posts written by

Galindez and Simpich that included negative and critical coverage of the military judicial

system. Simpich Decl. ¶ 9, see the Army's press advisory at A-1; Plaintiffs' request for

press credentials at A-3; Army's acknowledgement of receipt at A-4.

On May 30, 2013, the

Plaintiffs were notified that the requests for media credentials for Galindez, Simpich, and

Rudin were all denied. At the time, no explanation was provided for this denial, other

than a generalized need to provide varied representation among members of the media.

Of the 370 members of the media who petitioned for access, only 80 were granted.  All

organizations received at least one credential which could be shared, except for Reader

Supported News and Workers Viewpoint. Petitioners William Simpich and Scott

Galindez are reporting on the Manning trial for Reader Supported News. On May 31,

2013, the Plaintiffs filed a motion to intervene with the First Judicial District, and

requested that Defendant Lind hear their motion. In this motion, Plaintiffs cited the

refusal to provide media credentials and other issues as well. Decl. ¶ 10, see the notice of

denial at A-5; motion at A-6.

Plaintiffs informed Defendant Lind that the Military District of

Washington to provide reasonable notice to the media and the public that there was a

540-seat public theater where the trial could be viewed; thus providing the public image

8

of openness but not the public knowledge that this theater was accessible. As a result, this theater is now closed due to lack of use, but will inevitably be needed for a high-profile witness such as Bradley Manning when he testifies. Decl. ¶ 11

Plaintiffs also referred the arbitrary decision of the Military District of Washington to provide a media operations center on the base that only accommodated 70 members of the media. In another arbitrary decision, it was announced in the press advisory that the courtroom had ten seats for the media, and 16 seats for the public. On this basis, only eighty press credentials were provided. Plaintiffs submitted a FOIA and learned that several major news agencies that had requested up to ten or more credentials in order to bring a full team of reporters were only given between one and three credentials and forced to rotate for no good reason. Decl. ¶ 12, see the notice of denial at A-5; FOIA response re issued credentials at A-12.                                   In the media operations center, the military provides closed-circuit communications to the media; the media has been told that it cannot use any means to capture these transmissions. There is an also an overflow trailer that is used when the courtroom is full, which enables the public to view the video and audio feed from the courtroom. All the courtroom proceedings are audio recorded. At the end of each court day, the defense is provided a copy of the audio feed from the defendants.   Pursuant to defendant Lind's direction, counsel are only permitted to use these copies in support of their motions. The press and the public has not been provided with copies of this audio feed, despite requests. This situation creates a two-tier system – those who can capture the transmissions, and those who cannot. Decl. ¶ 13; see the attached Supplemental Declaration of Shayana Kadidal, previously filed as A-234-235 in the related case of

9

*Center for Constitutional Rights v. Lind,* reproduced here at A-37.

In the media operations center, members of the press are unable to file their stories unless and until court is in recess. Moreover, after an unknown party captured a statement made by Bradley Manning with a cellphone several months ago, no one is allowed to even text on their cellphones in the media center. Although the center is a half mile away from the courtroom, the defendants place these restrictions on the basis that "the center is an extension of the courtroom". One representative of the Army media corps said that access was "a privilege, not a right". Decl. ¶ 14          The plaintiffs and the other media and public barred from the media operations center are consigned to the overflow trailer. Not only are these parties subjected to the same restrictions as those in the media operations center, but these individuals are not allowed access to their laptops at all while in the overflow trailer. At that location, the plaintiffs and other media and the public are only able to passively watch these transmissions and write down their observations with pen and pencil. This same situation occurred in the public theater, which has been closed down since opening statements for lack of use, but will be needed again during key witness testimony and during closing argument. This situation creates another two-tier system – those who can type their observations, and those who cannot. Decl. ¶ 15          Two courtroom artists have been given media credentials throughout the proceedings, and that relationship seems likely to continue. Petitioner Kay Rudin, the courtroom artist with Reader Supported News, deserves an equal opportunity to access to the courtroom with these courtroom artists at times when the courtroom is filled with spectators during high-profile witnesses. A courtroom artist cannot accurately convey to the public what is going on in the

10

courtroom without direct access to the courtroom itself. This situation creates yet another
two-tier system – those who can portray the proceedings with media credentials, and
those who cannot. Decl. ¶ 16.                On Monday, June 3, 2013, on the
first day of trial, Defendant Lind noted the Plaintiffs' motion to intervene and took it
under advisement. At the hearing, the prosecution stated that Reader Supported News
("RSN") journalists were denied media credentials because RSN were not in the Vocus
database, and that that was in the press advisory. The prosecutor got it wrong, as the PR
media monitoring database Vocus is not mentioned in the press advisory. Plaintiffs
Galindez and Simpich were told the same thing by Mary Doyle of the Army press corps
on June 4, 2013. Reader Supported News is all over the internet and has a significant
presence. Plaintiffs are unconvinced that Vocus failed to pick up RSN in their
surveillance sweep. Decl. ¶ 17 see transcript for 6/3/13 hearing, pp. 7, 11-12, 24-25 of
106, A-23.                          Vocus monitors over 130,000 media outlets,
including online news sources, print publications, blogs, and broadcast media. Public
relations professionals report that Vocus is used by PR much as Westlaw or Lexis is used
by attorneys. Their PR suite software provides a media database of more than 400,000
journalists and bloggers as well as news, blog, and social media monitoring. Vocus
customers use it for research, to create media lists and learn about reporters, and to track
one's engagement with them. Vocus provides communications command and control for
talking with reporters. Vocus can tell its customers whether the media outlets are
"positive or neutral." Decl. ¶ 18

              Plaintiffs made FOIA requests to the Military District of
Washington, and were informed that of all those who made requests for media credentials

11

within the arbitrary deadline created  by the defendants, the only ones who were denied

media access were the Plaintiffs and those journalists from Workers Viewpoint.

Plaintiffs allege that this is an instance of content-based discrimination, as the plaintiffs

are being discriminated against based on the perception that their reporting on the

*Manning* case will be "negative" when compared to other reporters.   Decl. ¶ 19.

Defendant Lind denied plaintiffs' motion on Monday, June 10, stating that

the journalists at RSN do not have standing to bring a motion to intervene for full media

access to the trial, based on *ABC, Inc. v. Powell*, 47 M.J. 363 (1997).  She stated that

only the prosecution and defense can decide if such a motion can be brought.  The First

Amendment and common law rights of access of the press and the public to this

important court-martial proceeding cannot be so subjected to the whims and desires of

trial counsel.  *ABC v. Powell* plainly states that "when an accused is entitled to a public

hearing, the press enjoys the same right and has standing to complain if access is denied."

Decl. ¶ 20, see transcript for 6/10/13 hearing, pages 15-17 of 144, A-30-33.       This is

a particularly remarkable situation, given that Judge Lind is a national expert on the

subject of media access to military court proceedings. She wrote an erudite law review

article on this subject, in which she stated that "the media has standing to challenge denial

of access".  163 Military Law Journal 1, 19 (2000)  Decl. ¶ 21.       At p. 61 of this

article, she cites *Powell* itself in support of this premise.       Plaintiffs make the arguments

below as members of the media and as members of the public.

### ARGUMENT

- **Plaintiffs are injured by not receiving the media credentials**

- **No narrowly tailored decision was made by Defendant Lind to exclude Plaintiffs from receiving media credentials and use of the media operations center**

Rules of Court-Martial 806 makes it very clear that the decision to exclude anyone from the courtroom is to be made by Defendant Lind in a narrowly tailored manner. The Army's position is that the media center is an extension of the courtroom. Thus, Rule 806 must be applied to any exclusion from the media operations center of a commercial online media outlet that has conformed with all of the regulations. Such a decision cannot to be delegated to the Army press corps.                                    Similarly,

Rule of Court-Martial 806(a) states that the court-martial shall be open to the public. The defendants are treating the media operations center, the overflow trailer and the public theater as "an extension of the courtroom". The discussion of this rule states that "when public access to a court-martial is limited for some reason, including lack of space, special care must be taken to avoid arbitrary exclusion of specific groups or persons. This may include allocating a reasonable number of seats to members of the press and to relatives of the accused."                        This directive is made more specific by Rule 806(b), which states that when specific persons are excluded from the courtroom, "the military judge must make findings on the record establishing the reason for the exclusion, the basis for the military judge's belief that exclusion is necessary, and that the exclusion is as narrowly tailored as possible". The petitioners have the right to know the process that was used to determine who was excluded from the media operations center, and whether the judge made the narrowly tailored findings as mandated by Rule 806.

Rule 806(c) states that audio transmission is generally barred, but that "the

13

military judge may, as a matter of discretion, permit contemporaneous closed-circuit…audio transmission to permit viewing or hearing…by spectators when courtroom facilities are inadequate to accommodate a reasonable number of spectators".        Judge Lind has permitted audio transmissions, but refused to hear the plaintiffs' motion for media access, on the grounds that she does not have jurisdiction to hear the request. Defendant Lind denied plaintiffs' motion on Monday, June 10, stating that the journalists at RSN do not have standing to bring a motion to intervene for full media access to the trial, based on *ABC, Inc. v. Powell*, 47 M.J. 363 (1997).   She stated that only the prosecution and defense can decide if such a motion can be brought. The First Amendment and common law rights of access of the press and the public to this important court-martial proceeding cannot be so subjected to the whims and desires of trial counsel. *ABC v. Powell* plainly states that "when an accused is entitled to a public hearing, the press enjoys the same right and has standing to complain if access is denied." 47 M. J. 363, 365.  For Judge Lind's ruling, see transcript for 6/10/13 hearing, pages 15-17 of 144, A-30-33.

This is a particularly remarkable situation, given that Judge Lind is a national expert on the subject of media access to military court proceedings. She wrote an erudite law review article on this subject, in which she stated that "the media has standing to challenge denial of access". 163 Military Law Journal 1, 19 (2000)  She goes on to cite *Powell* itself in support of this premise. *Id.*, at p. 61, fn. 334.        Judge Lind's article also cites *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606 (1982) in support of this basic right. *Id.*

14

- **Plaintiffs' limited right to access is not adequate**

As further demonstrated below, it is readily apparent, in the context of the *Manning* case and otherwise, that the limited right of access is not adequate to assure the public's and the media's rights that are relevant to the newsworthy issues being adjudicated in the Manning trial and that will enhance full, robust, and timely public debate about those issues.

The plaintiffs are injured by not getting the media credentials. The reporters Galindez and Simpich can't be in the remote sites and use their laptops, the tools of the trade of journalists and their right as members of the public. Nor can they text on their cellphones to their editors or to each other while working at the remote sites. The Supreme Court has held that the press and general public have a constitutional right under the first amendment to access to criminal trials. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). In *Waller v. Georgia*, *supra*, the Supreme Court applied the same test to a defendant's objection to closure of a suppression hearing as had been applied in first-amendment cases, stating "that the explicit [s]ixth [a]mendment right of the accused is no less protective of a public trial than the implicit [f]irst [a]mendment right of the press and public." 104 S.Ct. at 2215. The stringent test to be met before closure of a criminal trial to the public is set out in *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), to wit: the party seeking closure must advance an overriding interest that is likely to be prejudiced; the closure must be narrowly tailored to protect that interest; the trial court must consider reasonable alternatives to closure; and it must make adequate

15

findings supporting the closure to aid in review.

In this case, there are specific seats set aside for the media as well as the public in the courtroom. Ten seats have been allocated for the media, sixteen for the public. Since the opening statements, the courtroom frequently has enough seating for all – the problem is access as a member of the media pool and/or access to laptops and cellphones when a key witness such as Pfc. Manning is testifying.   Many members of the media had to appeal to the judge before credentials were provided for the two stenographers whose work is accessible to all.                                           The most important place for the plaintiffs to be is in the media operations center, which is presently the only place that they can use their laptops at all. The position of the court and the prosecution is that the media operations center is an "extension of the courtroom" and that "the court has approved a relaxation of the rules in the media operations center solely for the purpose for having laptops to prepare stories for publications, but no live recording or live publication. It is not until there is a recess when court is not in session that members of the media are allowed to upload or connect outside of media operations center, and then during that recess that's when news stories will be published. And again, there's no recording devices authorized. So laptop computer, handheld recording devices or cellphone." (Unofficial transcript, 6/3/13, p. 12)  The media operations center is approximately half a mile away from the courtroom.

The plaintiffs have been denied adequate media credentials in this case, for no good reason.  The number one reason at this point is that all of the sites should have the same rules as the media operations center.   The public theater and the overflow trailer

16

should have the same rules as the media, because the media and the public have the same rights.

Secondly, the prosecutor and the Army media corps have said that plaintiff Reader Supported News (RSN) and/or the plaintiffs did not come up in the survey of commercial online media services conducted by the PR media monitoring service Vocus as an online presence on the internet.  Moreover, the prosecutor's claim that the press advisory mandated that the plaintiffs be "listed in the Vocus system which is one of the requirements of being (a) registered, independent commercial press service organization" is simply inaccurate. A quick review of the two page press advisory reveals there is no requirement that any of the journalists or news organizations be listed in Vocus.

Vocus monitors over 130,000 media outlets, including online news sources, print publications, blogs, and broadcast media. Public relations professionals report that Vocus is used by PR much as Westlaw or Lexis is used by attorneys.  Their PR suite software provides a media database of more than 400,000 journalists and bloggers as well as news, blog, and social media monitoring. Vocus customers use it for research, to create media lists and learn about reporters, and to track one's engagement with them. Vocus provides communications command and control for talking with reporters. Vocus can tell its customers whether the media outlets are "positive or neutral."

Whether Vocus' information is accurate or inaccurate is of no matter.  RSN and its reporters are legitimate members of the media in every sense of the word. There is no good reason for eighty members of the media to be given media credentials, and for Reader Supported News and Workers Viewpoint to be the only two media outlets to be

17

initially denied media credentials. All of RSN's credentials should be granted. As the media and the public have the same rights, they should be treated the same. If the Court believes a different approach is needed, the Defendants should be told to find a bigger location for the media.

- **The audio feed should be provided on a daily basis for fact-checking purposes, just as it is to the Army and the defense**

  - **Given this procedure, Plaintiffs are entitled to contemporaneous access**

Pursuant to RCM 806, the judge has determined that closed circuit transmissions are necessary to accommodate an overflow of spectators. It is for this reason that audio and video feeds are piped into each of the sites outside the courtroom.

Pursuant to court order, the defense receives a copy of the audio feed from the Army at the end of each court day. The media and the public are entitled to contemporaneous copies of the audio feed as well. The need to fact-check on a contemporaneous basis is paramount. Otherwise, the media simply cannot do its job effectively in a highly important case that involves many technicalities. Minutes matter.

The Rules for Court Martial expressly contain the mandate that "courts-martial shall be open to the public." See R.C.M. 806. Thus, there is nothing in the governing rules for court-martial proceedings that indicates in any way that the President intended that those proceedings should not be subject to the same First Amendment principles governing public rights of access to the trials of federal criminal cases in the District Courts.

18

The right of public access exists primarily to ensure that courts have a "measure of accountability" and to promote "confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). Access to information is especially important when documents generated by a trial concern matters relating to national defense and foreign relations, where public scrutiny is the only effective restraint on government. See *New York Times v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("In the absence of the governmental checks and balances present in other areas of our national life, the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry -- in an informed and critical public opinion which alone can here protect the values of democratic government.")                   The Supreme Court also has repeatedly stated that openness has a positive effect on the truth-determining function of judicial proceedings. See *Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) ("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S.555, 596 (1980) (open trials promote "true and accurate fact-finding") (Brennan, J., concurring); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("[P] ublic scrutiny enhances the quality and safeguards the integrity of the fact finding process."); see also *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983) (Gannett's beneficial "fact-finding considerations" militate in favor of openness "regardless of the type of proceeding"). This effect is tangible, not speculative: the Supreme Court has held that openness can affect outcome. Accordingly, if the

19

government attempts to restrict or deny the right of access, it bears the strictest of burdens: it must show that the limitation is necessary to protect a compelling government interest and is narrowly tailored to serve that interest. See *Washington Post Co. v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991)

Moreover, public access must be contemporaneous with the actual proceedings in order to maximize this error-correcting aspect of openness. The Supreme Court has long held that contemporaneous access to criminal proceedings is necessary to serve the various functions –encouraging public legitimation, diligent and upstanding official behavior, and error-correction –that public access has traditionally served. As early as 1948 the Court had announced that "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." *In re Oliver*, 333 U.S. 257, 270 (1948) (emphasis added).

*Oliver* was decided under the Due Process Clause, but federal courts have extended the contemporaneous access principle to Sixth Amendment cases where defendants sought to make proceedings and information public. *Huminski v. Corsones*, 386 F.3d 116, 143 (2d Cir. 2004), as amended on reh'g, 396 F.3d 53 (2d Cir. 2005) ("Sixth Amendment guarantees ... the right to a public trial principally to protect the defendant from prosecutorial and judicial abuses by permitting contemporaneous public review of criminal trials."); *United States v. Wecht*, 537 F.3d 222, 229-30 (3d Cir. 2008) ("Although post-trial release of information may be better than none at all, the value of the right of access would be seriously undermined if it could not be contemporaneous."); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 18

20

893, 897 (7th Cir. 1994) ("In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous. The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression."). Legitimacy, accountability, accuracy: these three principles motivating the Sixth Amendment right of contemporaneous access are the same values cited by the Supreme Court in support of the First Amendment right of public access recognized in Richmond Newspapers and its progeny.                                                                              The combination of

facts leading federal courts to need to decide whether a First Amendment claim for access to documents can be satisfied by a non-contemporaneous release occurs very rarely; but when it has, the courts have decided that release must be contemporaneous to be effective and thus to satisfy the First Amendment. See *Chicago Tribune Co. v. Ladd (In re AP)* , 162 F.3d 503, 506 (7th Cir. 1998) (in case involving request for access to "various documents that were filed under seal," Court of Appeals noted that "the values that animate the presumption in favor of access require as a 'necessary corollary' that, once access is found to be appropriate, access ought to be 'immediate and contemporaneous'"); *United States v. Smalley*, 9 Media L. Rep. 1255, 1256 (N.D. Tex. 1983) (granting newspapers' "motions for contemporaneous access" under the First Amendment to transcripts of evidence "now being introduced" at trial because "without contemporaneous access to the transcripts ... the press would be foreclosed from reporting at all on a significant portion of the prosecution's evidence"). See also *Associated Press v. United States Dist. Court for Cent. Dist.* , 705 F.2d 1143 (9th Cir. 1983) (even a 48-

21

hour preemptive sealing period designed by district court to allow parties to make more permanent closure motions, violates First Amendment right of public access).

                                                                These principles are

especially relevant in cases involving media plaintiffs. The failure to provide the audio feed here has had a dramatically inhibiting effect on the ability of the press to report fully and accurately on the Manning court-martial. Some news can be delayed ... without serious injury [for editorial reasons, but d]elays imposed by governmental authority are a different matter. ... As a practical matter ... the element of time is not unimportant if press coverage is to fulfill its traditional function of bringing news to the public promptly. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560-61 (1976). The judicially recognized need for contemporaneous access to court records by the press and public is consistent with the general First Amendment principle that the loss of First Amendment rights "for even minimal periods of time" constitutes irreparable harm, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)), a principle that underlies the many precedents allowing press petitioners to seek preliminary injunctions against measures restricting such First Amendment rights of public access, and to immediately appeal denials of public access under the collateral order rule, see *United States v. Wecht*, 537 F.3d 222, 229-30 (3d Cir. 2008).

### B. Neither the Government Nor the Military Court Has Identified Any Compelling Interest That Would Overcome the Very Strong Presumption in Favor of Contemporaneous Public Access

Even in cases implicating national security interests asserted by the government, the First Amendment demands that "[d]ocuments to which the public has a qualified right

22

of access may be sealed only if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (quoting *Press-Enter. Co*, 478 U.S. at 13-14). "[A] judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need" for the request. *Video Software Dealers Ass'n v. Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994). In assessing whether denial of public access is narrowly tailored, courts must "consider less drastic alternatives to sealing the documents, and ...provide specific reasons and factual findings supporting [the] decision to seal the documents and for rejecting the alternatives." *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000) (citations omitted); see also *United States v. Hershey*, 20 M.J. 433, 436 (C.M.A. 1985). The Supreme Court has stated that when a trial court finds that the presumption of access has been rebutted by some countervailing interest, that "interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510 (1984).                                                      Plaintiffs also enjoy a common law right of access to documents which is virtually coterminous with the First Amendment. A common law right attaches where documents are properly considered "judicial documents," including at a minimum documents that play a role in determining the litigants' substantive rights. See *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (including documents "relevant to the performance of the judicial function and useful in the judicial process"); see also *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (noting varying standards in different circuits). The audio feed at

23

issue here clearly qualifies as a "judicial document". The presumption in favor of public access to such documents will be given the strongest weight possible. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) ("presumptive right to 'public observation' is at its apogee when asserted with respect to documents relating to 'matters that directly affect an adjudication.'" (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995))). Under the common law standard, the public interest favoring access must be "heavily outweighed" by other asserted interests to overcome the presumption in favor of public access. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302(4th Cir. 2000) (citations omitted); see also *Stone v. Univ. of Maryland Medical Sys. Corp.*, 855F.2d 178, 180-81 (4th Cir. 1988). "[O]nly the most compelling reasons can justify non-disclosure of judicial records."*Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1, 6 (1st Cir. 2005); see also *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 474-476.(6th Cir. 1983) ("Appellants seek to vindicate a precious common law right, one that predates the Constitution itself. While the courts have sanctioned incursions on this right, they have done so only when they have concluded that 'justice so requires.' To demand any less would demean the common law right.").

In *United States v. Scott*, 48 M.J. 663 (Army Ct. Crim. App. 1998), pet'n for rev. denied, 1998 CAAF LEXIS 1459 (C.A.A.F. 1998), the ACCA applied standards for public access to documents generated during a court-martial proceeding that were identical to the First Amendment standards discussed herein. The *Scott* Court did not explicitly state that the First Amendment applied to the court documents — as eleven federal Courts of Appeal have done —nor did it explicitly assert that it was applying some alternate standard derived from the common law. But the court clearly applied the

24

same test that would have applied had it expressly found the First Amendment applicable. First, it criticized the trial court for ordering sealing of documents without finding factual support for a compelling interest, stating that the "party seeking closure must advance an overriding interest that is likely to be prejudiced,"id. at 666, and that that interest must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered," id . at 665-66. The Scott court found nothing in the record supporting a factual finding that a compelling interest was present: instead, the "military judge sealed the entire stipulation" — the contested document — "on the basis of an unsupported conclusion rather than on the basis of an overriding interest that is likely to be prejudiced if the exhibit is not sealed." Id. at 666. Moreover, "[r]ather than narrowly tailoring the order to seal those portions" that implicated any compelling interest, id. At 667 n.4, the trial judge erroneously sealed the "entire" document and all its enclosures, id. These are exactly the same standards that a court would apply under the First Amendment, as the ACCA itself noted earlier in the *Scott* opinion. Because the trial judge left "no basis evident in the record of trial [on appeal] that would justify sealing," id. at 667, the court found the trial court had committed an abuse of discretion, and vacated the order of sealing. At least one federal court, citing ACCA's decision in *Scott*, 48 M.J. at 665, 666, has implied that the Scott decision recognized a First Amendment right of access. See *Dayton Newspapers, Inc. v. United States Dep't of the Navy*, 109 F. Supp. 2d 768, 772 (S.D. Ohio 1999).

None of these necessary elements — public notice and opportunity to be heard, consideration of less-drastic alternatives (as part of a narrow-tailoring or common-law inquiry), and specific reasoning

supported by factual findings justifying the limitations on public access that have been imposed and rejecting less-restrictive alternatives — appear to have been satisfied by the military court in PFC Manning's case. There can be no possible justification for not making the audio feed available to the general public once the Army  and the defense has them. See *United States v. Antar*, 38 F.3d 1348, 1359-60 (3d Cir. 1994) ("the right of access ... encompasses equally the live proceedings and the transcripts which document those proceedings") In *Antar*, the Third Circuit further stated that "openness is ongoing—a status rather than an event. At the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to information; the Court never has suggested that an open proceeding is only open to those who are able to be bodily present in the courtroom itself. True public access to a proceeding means access to knowledge of what occurred there. It is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source."

It is "irrelevant" that the audio feed – as opposed to the transcript - might only be withheld under such a scheme for a day, id., as the loss of First Amendment rights in this context "for even minimal periods of time" constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 1971)).

As the presiding military judge, Judge Lind has supervisory power over the records and files of the Manning court-martial proceedings, and the inherent authority to direct public release of the records at issue here. *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978) ("Every court has supervisory power over its own records and files."); *United States v. Chisholm*, 58 M.J. 733, 738 (Army Ct. Crim. App. 2003) ("How a particular military

26

judge 'directs' the completion of a given record is a matter within his or her broad

discretion and inherent authority.").                              This Court must enter

a clear declaratory order that the First Amendment applies and that such documents

ordinarily should be released to the press and public without redaction or delay.

- **Contemporaneous reporting of the trial is injured by barring plaintiffs from using their laptops and cellphones at the remote sites**

The media operations center, the overflow trailer, and the public theater are all

treated as "extensions of the courtroom" by the military corps.  In all areas laptops and

cellphones are not allowed, with the exception that laptops are allowed in the media

operations center.  Even there, however, the laptops cannot be used to download or

upload documents while court is in session – they can only be used for typing.

These restrictions on laptop use at the remote sites violate the 1st Amendment by

preventing contemporaneous reporting of the trial.  They are designed to prevent the

media and the public from communicating with one another during the trial, and

impacting the plaintiffs' right to report freely and contemporaneously about the trial,

based on the same cases as set forth above.  These restrictions are designed to make it

more difficult to get a properly vetted story out in the tight deadlines imposed by editors.

The government has no compelling interest to the contrary. Plaintiffs should not be

punished for viewing the case at a remote site.                        Similarly,

these  restrictions on cellphone use violate the First Amendment.  Cellphones play an

invaluable role in texting and in internet communications.  Common sense dictate not

using them for speaking in a crowded room – an issue not in play here.  The military is

barring the media and the public from using these invaluable devices at the remote sites

for no good reason, in a manner designed to violate the core First Amendment right of

reporting freely about the trial. The quiet use of laptops and cellphones for e-mail and

other purposes in the overflow room was approved in *U.S. v. Bonds,* 2011 WL 902207, p.

2.

## Conclusion

Plaintiffs' motion should be granted in all

respects.

Dated:  July 6, 2013

WILLIAM SIMPICH

*In pro se*

SCOTT GALINDEZ

*In pro se and on behalf*

*Of Reader Supported News*

KAY RUDIN

*In pro se*